UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARIO ROQUE,                        :
                                    :CIVIL ACTION NO. 3:14-CV-2182
            Plaintiff,              :
                                    :(JUDGE CONABOY)
            v.                      :
                                    :
CAROLYN COLVIN,                     :
Acting Commissioner of             :
Social Security,                   :
                                    :
            Defendant.              :
                                    :

_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). (Doc. 1.)  The Administrative Law Judge ("ALJ") who evaluated the claim concluded in her June 24, 2014, Decision that Plaintiff's severe impairment of chronic headaches did not meet or equal the listings. (R. 14.)  The ALJ found that Plaintiff had the residual function capacity ("RFC") to perform light work with certain limitations and that jobs exist in significant numbers in the national economy that Plaintiff can perform. (R. 16, 19.)  The ALJ therefore denied Plaintiff's claim for benefits. (R. 20.)  With this action, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ erred by finding Plaintiff's multiple impairments to be non-severe; 2) the ALJ erred in assessing the credibility of Plaintiff's statements about the severity of his

symptoms; and 3) the ALJ erred in classifying Plaintiff's RFC as consistent with light work. (Doc. 13 at 2.) For the reasons discussed below, we conclude Plaintiff's appeal of the Acting Commissioner's decision is properly denied.

## I. Background

### A. Procedural Background

On May 1, 2013, Plaintiff protectively filed applications for Title II DIB and Title XVI SSI alleging disability beginning on July 18, 2011. (R. 12.) At the hearing held on June 19, 2014, Plaintiff amended the alleged onset date to March 23, 2013. (R. 12.) According to a May 29, 2013, Disability Report, Plaintiff claimed that the conditions limiting his ability to work were migraines, neuropathy, depression, and anxiety. (R. 190.) The claims were initially denied on July 1, 2013. (R. 12.) Plaintiff filed a request for a review before an ALJ on July 31, 2013. (*Id.*) In a Disability Report dated July 31, 2013, Plaintiff reported that his health status had changed, stating, "I have seizures muscle pain no energy want to sleep all the time." (R. 222.) On October 4, 2012, Plaintiff, with his attorney, appeared at a hearing before ALJ Reana Sweeney. (R. 26.) Vocational Expert Mitchell Schmidt also testified at the hearing. (*Id.*) The ALJ issued her unfavorable decision on June 24, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period. (R. 20.)

2

On December 14, 2012, Plaintiff filed a Request for Review with the Appeal's Council. (R. 7-8.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision on September 23, 2014. (R. 1-6.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

On November 13, 2014, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision. (Doc. 1.) Defendant filed her answer and the Social Security Administration transcript on January 21, 2015. (Docs. 11, 12.) Plaintiff filed his supporting brief on March 6, 2015. (Doc. 13.) Defendant filed her opposition brief on April 16, 2015. (Doc. 16.) Plaintiff filed his reply brief on April 25, 2015. (Doc. 17.) Therefore, this matter is fully briefed and ripe for disposition.

## B.    *Factual Background*

Plaintiff was born on November 2, 1971. (R. 19.) He was forty-one years old on the alleged disability onset date. (*Id.*) The Disability Report indicates that plaintiff completed eleventh grade (R. 191), but Plaintiff testified that the highest grade he completed in school was eighth grade (R. 36). He also testified that he has tried to get his GED but did not complete it. (R. 37.) At the time of the hearing, Plaintiff resided at Bethesda Mission and continues to do so. (R. 32; Doc. 13 at 22.) Plaintiff testified that he is married but had been separated from his wife for two years at the time of the hearing. (R. 32.) He worked as a

3

landscape laborer and material handler.  (R. 18.)  The Disability Report indicates Plaintiff stopped working on September 1, 2012, because of his conditions.  (R. 190.)

**1.   Medical Records and Notes**

***a.   Headaches***

At a December 19, 2012, office visit to the Kline Health Center, Plaintiff saw Rumon Chakravarty, M.D., and presented with headache, reporting that headaches had been going on for more than a year.  (R. 517.)  Plaintiff had been taking Lyrica which he said had helped.  (*Id.*)  He reported that he had headaches about three times per week and he associated some with blurry vision.  (*Id.*)

On January 31, 2013, Plaintiff was seen at the Milton S. Hershey Medical Center with multiple complaints, including headaches.  (R. 415.)  A neurology follow-up was recommended. (*Id.*)

On March 16, 2013, Dr. Chakravarty noted that Plaintiff's headache issue was "stable, getting better, on verapamil."  (R. 544.)

On May 5, 2013, Plaintiff went to Pinnacle Health Harrisburg Campus emergency room complaining of ongoing headache.  (R. 908.) The following history was recorded:

> The patient complains of a pounding headache
> on the entire left side of his head and
> states the entire left side of his body feels
> numb.  The patient is [sic] had these
> headaches for several years he has been seen

4

> here in emergency department several times in
> the last couple of months for this pain.  He
> did have an MRI and MRA of his brain done in
> February of this year this was an
> unremarkable study.  The patient states his
> pain has persisted that it begins when he
> wakes up in the morning lasts all day long
> that he is a landscaper and has not been able
> to go to work because of this pain and
> discomfort.

(R. 908.)  Plaintiff's neurological examination showed the

following: "Cranial nerves are grossly intact the patient has no

focal or lateralized motor weakness he performs rapid alternating

movements and finger-to-nose without difficulty there is no

pronator drift he ambulates wihout difficulty mental status is

normal."  (R. 909.)  Plaintiff was advised that he needed to be

seen and evaluated at a headache clinic--he was asked to call the

Hershey Medical Center and follow up there.  (*Id.*)

On June 17, 2013, Plaintiff presented to the emergency room at

Holy Spirit Hospital with multiple complaints, including headache

which he said were chronic.  (R. 691.)

On July 1, 2013, Plaintiff was seen at the Hershey Neurology

Clinic upon referral of Dr. Chakravarty for ulnar nerve neuropathy.

(R. 509.)  Plaintiff presented with a history of migraine

headaches--reporting the headaches began in 2011 and he had noticed

a progression over the past six months.  (*Id.*)  He described the

discomfort as pounding and reported that his symptoms are every day

and constant.  (*Id.*)  It was also recorded that Plaintiff

> has associated symptoms of nausea,

5

> photophobia, phonophobia, imbalance and left-
> sided numbness and tingling involving the
> left V1-V3 region, left arm and left leg.  He
> reports due to the discomfort, he stays in a
> dark quiet room with the lights off.  He
> reports he has had a head CT and brain MRI in
> the past, which have both been negative.  He
> denies any head trauma or exposure to toxins.

(R. 509.)  Life style modifications, including dietary changes, were reviewed.  (R. 511.)  For preventative treatment amitriptyline was prescribed; for abortive treatment Plaintiff was to continue Tramadol.  (*Id.*)  Other treatment options were discussed but Plaintiff declined them.  (*Id.*)  The reviewing physician found that Plaintiff had left-sided numbness and tingling and left arm weakness, opining this could be due to central or peripheral nervous system causes.  (*Id.*)  The plan was to obtain previous test results and then determine if other workup would be needed.  (*Id.*)

On July 26, 2013, Plaintiff went to PH Surgical Consultants for a muscle biopsy.  (R. 585-86.)  The chronic problems listed include headache. (R. 586.)

Plaintiff was seen at Hershey Medical Center Neurology Clinic on August 2, 2013.  (R. 501.)  Plaintiff denied any progression over the past few months.  (*Id.*)  The headaches were described as they had been at his July 1, 2013, visit but he did not have nausea, photophobia or phonophobia and he occasionally had numbness and tingling with the headache.  (*Id.*)  Plaintiff noted that the severity of the headaches had decreased though he was still getting headaches on a daily basis.  (*Id.*)

6

At Plaintiff's September 23, 2013, office visit to Kline Health Center, it was noted that Plaintiff's headaches were chronic and he was on pain medication.  (R. 758.)

At a pain management visit to Hershey Medical Center on October 14, 2013, Plaintiff's complaints did not focus on headaches but on pain in both shoulders, his lower lumbar spine and left leg. (R. 601.)  At the time Plaintiff was newly diagnosed with diabetes and polymyositis.  (*Id.*)  It was noted that Plaintiff had recently seen neurology for treatment of his migraine headaches, and was "taking amitriptyline at night which helps with his sleep as well as diclofenac for abortive migraine therapy and Excedrin Migraine for abortive treatment."  (R. 602.)

At a follow up neurology visit at Hershey Medical on Novemeber 1, 2013, Plaintiff's history of chronic daily headaches was noted. (R. 668)  The headaches were similar to those previously described but he did not have nausea, photophobia or phonophobia and dizziness with the headaches.  (*Id.*)  Plaintiff noted that the severity of the headaches had decreased though he was still getting headaches on a daily basis.  (*Id.*)  The Assessment indicates chronic daily headaches that have a musculoskeletal component.  (R. 670.)  It was recommended that Plaintiff continue with preventive treatment.  (*Id.*)  Physical therapy was also recommended: myofascial release for his musculoskeletal-type headache.  (*Id.*)

In an urgent care visit to Kline Health Center on November 25,

7

2013, Plaintiff presented with back and leg pain as well as pounding headaches.  (R. 772.)  He reported that the headaches had been worse over the previous two days.  (*Id.*)

On December 18, 2013, Plaintiff went to Kline Heath Center for a follow up stating that his pain and symptoms were getting worse. (R. 789.)

On March 14, 2014, Plaintiff was seen at the emergency room at Pinnacle Health Harrisburg Campus.  (R. 822.)  The attending physician was Richard Luley, M.D., and the primary nurse was Nicole Baselj, R.N.  (*Id.*)  Plaintiff's chief complaint was leg pain and he stated that he had constant migraine headaches.  (*Id.*) Plaintiff denied drug use--he was asked specifically about it and stated he never used drugs and never used heroin.  (*Id.*)  When advised that his records showed otherwise, he admitted that he used heroin a long time ago.  (*Id.*)  The recorder noted that the visit to the emergency room was Plaintiff's twenty-first and many visits were for pain problems.  (*Id.*)   Plaintiff's primary diagnosis was bilateral lower extremity pain, "ADDITIONAL: suspect drug-seeking behavior."  (*Id.*)

### b. Polymyositis and Neuropathy

On January 31, 2013, Plaintiff was seen at the Milton S. Hershey Medical Center with complaints of numbness and tingling in left arm and hand and persistent headaches.  (R. at 415.)  He was referred to the neurology clinic.  (*Id.*)

8

On March 6, 2013, Plaintiff saw Dr. Chakravarty at the Kline Health Center, presenting with hypertension and hepatitis c with the added comment that Plaintiff stated that he had been having some peripheral neuropathy which had not improved. (R. 541.) In the Review of Systems, Plaintiff noted fatigue, anxiety, extremity weakness, and numbness in extremities. (R. at 541-42.) On physical examination of the extremities, Dr. Chakravarty noted the dorsalis pedis pulses were normal and no edema was present. (R. 544.) He also found that Plaintiff demonstrated appropriate mood and affect. (*Id.*) In his Assessment/Plan, Dr. Chakravarty raised the possibility of polymyositis, and noted he would start a trial of steroids, consult with rheumatology, and do further testing. (R. 544.) He also noted peripheral neuropathy for which he planned to increase the dosage of gabapentin. (*Id.*)

In an office visit on April 8, 2013, to the Kline Health Center, Liya Galooshian, M.D., noted that Plaintiff had multiple visits between the emergency department and walk-in clinic for muscle pain, and he again presented for bilateral lower extremity pain. (R. at 559.) Dr. Galooshian reported the following:

> The pain started a couple months ago, first in his left leg and now in his right leg as well. He describes the pain as being in his muscles, sharp in quality, and progressively worsening. He was seen in the clinic last week and an EMG with muscle biopsy was ordered (for suspision [sic] of myositis) however, patient says he never got called. He does tell me he has an appointment scheduled in July with Dr. Saacchs in the

9

> Rheumatology clinic.  He has been taking his
> tramadol, ibuprofen, prednisone, and
> gabapentin as prescribed by his PCP but he
> tells me he is not getting any relief.  He
> denies any trauma to his legs.

(R. 559.)  Under Assessment/Plan, Dr. Galooshian identified

myositis, noting that Plaintiff had an appointment with the

rheumatology clinic in July and a referral for an EMG study and

nerve biopsy which had not yet been scheduled.  (R. at 562.)

On May 5, 2013, Plaintiff went to Pinnacle Health Harrisburg

Campus for headache.  (R. 908.)  In the review of systems,

Plaintiff denied back pain and mylagias.  (*Id.*)  Physical

examination of the extremities showed normal inspection, normal

range of motion and motor strength, sensation intact, and no edema.

(R. 909.)

In an office visit on June 11, 2013, to Hershey Medical Center

neurology clinic, Plaintiff was seen by CRNP Rashmi Agarwal for a

follow-up visit regarding his left upper extremity paresthesias and

weakness.  (R. 501.)  CRNP Agarwal referred to an EMG study dated

May 9, 2013, which showed ulnar nerve entrapment/neuropathy at the

left elbow, adding that a myopathic disorder affecting the proximal

left upper and lower extremities could not be ruled out.  (R. at

503.)  Plaintiff reported that he had arm weakness over the

previous few months, that he was having trouble lifting objects

with his left arm, and weakness had progress to his bilateral lower

extremities.  (R. 502.)  He also reported that an EMG nerve

10

conduction study showed neuropathy and that he was scheduled for a muscle biopsy on August 14th. (*Id.*)   In the Assessment and Plan, CRNP Agarwal reported the following: "He does have subjective symptoms of progressive lower extremity and left upper extremity weakness and paresthesias although has a normal neurologic exam and normal brain imaging." (R. 502.)  CRNP Agarwal requested a cervical spine MRI to look for any other central causes and also requested additional records. (*Id.*)

Plaintiff underwent a left anterior thigh quadriceps muscle biopsy on August 20, 2013. (R. at 655.)  The diagnosis was inflammatory myopathy consistent with polymyositis. (*Id.*)

On September 7, 2013, Plaintiff went to the emergency room at Pinnacle Health Harrisburg Campus because of left leg pain which he reported to have had for two weeks. (R. 894.)  Plaintiff said that he had recently had a muscle biopsy and polymyositis had been diagnosed. (*Id.*) He further reported that he had been taking tramadol for pain without relief, his pain was 8/10 in severity, he was able to walk, move, and bend his leg as usual but the upper lateral aspect of his left thigh had decreased sensation. (*Id.*) Review of the musculoskeletal system indicates Plaintiff reported injury; neurologically he reported headache and denied sensory changes. (R. 894.)  Physical examination of the lower extremity showed normal range of motion, normal motor strength, sensation impaired to the left lower extremity, decreased sensation to the

left upper lateral thigh, pedal pulse normal, a well-healed surgical scar noted to anterior central left thigh mildly tender to palpation without palpable hematoma or abscess, no drainage or evidence of cellulitis, and Plaintiff ambulated without difficulty. (R. 895.)   Neurologically Plaintiff was oriented to person, place and time and his speech and gait were normal.  (R. 887.)   The doctor noted that the mildly impaired sensation to the left thigh was likely nerve palsy secondary to the biopsy procedure and he explained the self-limiting nature of the problem to Plaintiff. (R. 895.)   Plaintiff was given a prescription for norco for his acute pain and directed to follow up with his primary care physician.  (*Id.*)

On September 19, 2013, Plaintiff went to the emergency room at Pinnacle Health Harrisburg Campus for evaluation of hyperglycemia, thinking he had hyperglycemia because he had been having urinary frequency and thirst.  (R. 886.)   He also wanted narcotics for chronic pain.  (*Id.*)   Review of symptoms indicates Plaintiff denied back pain and injury and sensory changes; he reported myalgias and headache.  (*Id.*)   Examination of the back and upper and lower extremities was normal.  (R. 887.)   When Plaintiff requested ongoing narcotics for his chronic pain, the doctor advised him to discuss this with his primary care physician.  (R. 888.)   He was also to follow up regarding possible diabetes.  (*Id.*)

Plaintiff was seen for an office visit at the Kline Health

12

Center on September 23, 2013.  (R. 754.)  The visit was a follow up to an emergency room visit the preceding week where Plaintiff was found to have high blood sugar.  (R. 755.)  The Review of Systems was negative and muscoloskeletal "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection" was noted.  (R. 758.)  It was also noted that Plaintiff was on a heavy dose of steroids for "Symptomatic inflammatory myopathy."  (*Id.*)

On September 30, 2013, Plaintiff went to the emergency room at Pinnacle Health Harrisburg Campus for back pain.  (R. 880.)  He said his pain was uncontrolled and he was not able to walk due to pain.  (*Id.*)  He reported left leg muscle weakness and new pain shooting into his left lower back, stating the pain was the worst it had been and ranking it at 8/10.  (*Id.*)  In the review of systems, Plaintiff reported back pain, leg pain and weakness. (*Id.*)  Neurologically he reported focal weakness and denied headache or mental status changes.  (*Id.*)  Physical examination of the back "included findings of normal inspection, range of motion normal, tenderness, paraspinal to the left lower back, no pain with straight leg raise."  (R. 881.)  Upper extremity exam "included findings of normal inspection, range of motion normal, Radial pulse normal."  (*Id.*)  Lower extremity exam "included findings of normal inspection, range of motion normal, Motor strength normal, Posterior tibial pulse normal."  (*Id.*)  Neurological exam findings

13

"include patient oriented to person, place and time, Speech normal, Gait normal, Cranial nerves intact, Deep tendon reflexes normal, no focal motor deficits, no focal sensory deficits, no cerebellar deficits." (*Id.*)  Plaintiff was given percocet and directed to keep his pain control appointment scheduled for the following week. (R. 882.)

On October 4, 2013, Plaintiff went to the emergency room at Pinnacle Health Harrisburg Campus primarily for chest pain.  (R. 872.)  Under musculoskeletal review of systems, Plaintiff denied back pain and reported chronic headaches.  (*Id.*)  Physical examination of the back and upper and lower extremities were normal as was his neurological exam.  (R. 873.)  When the doctor began discussing discharge with Plaintiff, Plaintiff requested oxycodone refills, stating that his primary care doctor told him to go to the ER for refills.  (*Id.*)  Plaintiff was told to contact his primary care doctor.  (*Id.*)  It was also noted that Plaintiff had been in the ER for pain related complaints two other times since the beginning of September.  (R. 873-74.)

In another emergency room follow up on October 9, 2013, for high blood sugar, under Review of Systems "Musculoskeletal" it was noted to be "[n]egative for bone/joint symptoms, joint swelling, muscle weakness and weakness." (R. 760-61.)  Musculoskeletal physical examination showed "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on

14

inspection." (R. 763.) Regarding symptomatic inflammatory myopathy, it was noted that Plaintiff was to see a specialist as advised and consider reducing the steroid dose. (R. 764.)

During a pain management evaluation on October 14, 2013, Plaintiff reported experiencing pain in both shoulders, lower lumbar spine and left leg. (R. at 601). Vitaly Gordin, M.D. noted that Plaintiff had recently been diagnosed with diabetes and polymyositis and was started on prednisone therapy for the polymyositis. (*Id.*) Plaintiff stated that the pain had not changed with the steroid treatments. (*Id.*) Dr. Gordin observed that his reflexes were markedly decreased, absent to 1/4 in brachioradialis, biceps, patella and Achilles; tenderness over lower lumbar spine in L4 to L5 area and right paraspinal tenderness in lower lumbar area. (R. at 602.) Plaintiff's physical examination was otherwise unremarkable, and Dr. Gordin noted that all diagnostic imaging and results were reviewed with no acute findings. (*Id.*) Dr. Gordin diagnosed neuropathic pain, left neuropathy in arm concerning for ulnar nerve and entrapment syndrome. (R. at 602, 603.) Because Plaintiff had tried Neurontin and Lyrica in the past without relief for his neuropathic pain, Dr. Gordin had nothing further to suggest for treatment of the neuropathic pain. (R. 603.) He recommended that Plaintiff continue the oxycodone for pain relief and amitriptyline at night "as it helps with both pain and depression symptoms." (*Id.*)

15

On October 21, 2013, Plaintiff went to the emergency room at Pinnacle Health Harrisburg Campus with the chief complaint of chronic pain. (R. 866.) Review of the muscoloskeletal system states that Plaintiff reported back pain and myalgias. (*Id.*) Physical examination of the back included findings of normal inspection and normal motor strength. (*Id.*) Examination of upper extremity included findings of normal inspection and normal motor strength. (*Id.*) Lower extremity examination included findings of inspection normal, range of motion and motor strength normal, sensation intact, mild tenderness palpating left lateral thigh, and no pain in joints or hips. (*Id.*) Plaintiff received IV dilaudid in the ER and asked to be discharged. (R. 867.) The doctor explained that they did not refill narcotic prescriptions through the emergency department and he should call the pain clinic the next day. (*Id.*)

On November 20, 2013, Plaintiff saw Dr. Chakravarty at the Kline Health Center for a three-month follow up visit. (R. 765-66.) Plaintiff reported that he still had some pain in his muscles, he had been diagnosed with polymyositis and he was scheduled to see rheumatology the following week. (R. 766.) Musculoskeletal review of systems was positive for back pain and joint pain. (R. 767.) Musculoskeletal examination showed "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (R. 769.)

16

On November 25, 2013, Plaintiff went to Kline Health Center for an urgent care visit and was seen by CRNP Kathleen Davidson. (R. 771-72.)  Plaintiff presented with back and leg pain which he reported had worsened three days earlier.  (R. 772.)  The Review of Systems in the Muscoloskeletal category was positive for back and leg pain.  (R. 773.)  Physical examination showed "[p]ain with palpation of lower lumbar, and SI regions over the spinal column. Straight leg raise negative for radiculopathy.  Pain in left ant. thigh with knee flexion and crossing L leg over R knee.  Medial rotation of hips causes pain in lower back."  (R. 775.)  The pain was thought likely related to the polymositis.  (R. 776.) Plaintiff was directed to follow up with his primary care doctor, rheumatology and pain management.  (*Id.*)

On November 30, 2013, Plaintiff went to the emergency room at Pinnacle Health Harrisburg Campus for chest pain.  (R. 857.) Muscoloskeletal and neurologic review of systems was negative.  (R. 857.)  Plaintiff's physical examination showed back, upper extremity and lower extremity range of motion normal.  (R. 858.)

In a follow up visit on December 4, 2013, Plaintiff was seen by Marion Kahn, M.D.  (R. 777.)  Plaintiff complained of weakness, severity level of moderate to severe.  (*Id.*)  Dr. Kahn noted that "[t]he problem is changing in character.  It occurs persistently. Location includes anterior proximal muscles."  (R. 778.)  She noted that symptoms are aggravated by fatigue and activities affected

17

include rising from a chair, climbing steps, and pushing.  (R. 778.)  Associated symptoms were noted to include dizziness, dyspnea, falling, gait disturbance, generalized pain, numbness and weakness.  (*Id.*)  On physical examination the lumbar spine showed tenderness, and right and left knees had crepitus.  (R. 782.) Elbows, hands, hips and pelvis showed no joint deformity, heat, swelling, erythemia or effusion and full range of motion.  (*Id.*) Dr. Kahn diagnosed polymyositis and her plan included referral to physical therapy.  (R. at 782, 783).

At a December 14, 2013, visit to the emergency room at Pinnacle Health Harrisburg Campus for chest pain Plaintiff's physical examination showed upper and lower extremity normal range of motion and normal muscle strength.  (R. 850.)

On December 18, 2013, Plaintiff saw Dr. Chakravarty and reported that his symptoms were getting worse, he was having more weakness, and he was feeling that eventually he may not be able to walk.  (R. 789.)  He had seen rheumatology and was scheduled to with infectious disease in January.  (*Id.*)  Plaintiff's Review of Symptoms was positive for back pain, joint pain, and muscle weakness.  (R. 790.)  Neurological/psychiatric review was positive for anxiety, depression, extremity weakness, gait disturbance, headache, and numbness in extremities. (*Id.*)  Physical examination of extremities showed normal dorsalis pedis pulses and no edema was present.  (R. 792.)  Neurological examination showed that motor and

18

reflexes were grossly intact and sensation normal; psychiatrically Plaintiff was oriented to time, place, person and situation and he demonstrated appropriate mood and affect.  (R. 793.)  The assessment was polymyositis and the plan was to decrease his steroid dose.  (R. 793.)  Dr. Chakravarty noted that rheumatology was not able to start Plaintiff on any new medications because of his latent TB and hepatitis but they would try to work out another drug regimen when he returned to rheumatology in February.  (*Id.*) Because he was in significant pain and the weakness and pain was worsening, Dr. Chakravarty "made an exception" and prescribed oxycodone 5 mg., adding that he told plaintiff "clearly that this is a short term measure and it will be stopped eventually."  (*Id.*)

At a January 5, 2014, visit to the emergency room at Pinnacle Health Harrisburg Campus for epigastric pain, Plaintiff denied back pain, myalgias, and headache.  (R. 839.)  Physical examination of the back, upper extremity and lower extremity were normal--normal range of motion and motor strength, intact sensation and no edema. (R. 840.)

On February 19, 2014, Plaintiff went to the emergency room at Pinnacle Health Harrisburg Campus for abdominal pain.  (R. 830.) Relative to her nueropathy/polymyositis, Plaintiff reported back pain and myalgias.  (R. 830-31.)  Physical examination findings included normal back exam, and normal upper and lower extremity examinations, including the notation that "[l]ower extremity exam

19

included findings of inspection normal, Range of motion normal, Pedal pulse normal, no edema." (R. 831.) Plaintiff requested a prescription for pain medication for his chronic pain due to polymyositis and was referred to his primary care physician for this. (*Id.*)

On February 26, 2014, Plaintiff again saw Dr. Chakravarty at the Kline Health Center for an office visit and stated that his symptoms were fairly well controlled and he was feeling about the same with no new complaints. (R. 795.) Review of neurological/psychiatric systems were reported as positive for anxiety, extremity weakness, gait disturbance, headache, numbness in extremities, and negative for depression and dizziness. (R. 796.) Musculoskeletal review was negative for back pain. (*Id.*) No neurological problems were recorded on physical examination and musculoskeletal physical examination showed normal range of motion, muscle strength, and stability in all extremities with no pain on inspection. (R. 798.) Extremities examination showed normal dorsalis pedis pulses and no edema. (*Id.*) "Active Medications at End of Visit" shows that Plaintiff was to take oxycodone. (R. 799.)

On March 18, 2014, Plaintiff had an office visit at Kline Health Center with Shaymal Mozumdar, M.D. (R. 800.) Plaintiff was seeking a medication refill, reporting that he had increasing aches and pains due to his myositis and he had an appointment with his

rheumatologist the following week.  (R. 801.)  Plaintiff also reported that he had run out of his pain medication.  (*Id.*)  Review of neurological/psyhiatric systems was negative for anxiety, depression and psychiatric symptoms as well as negative for gait disturbance.  (R. 802.)  Musculoskeletal review of systems was negative for bone/joint symptoms, joint swelling, muscle weakness and weakness.  (*Id.*)  On physical examination, Plaintiff had normal range of motion, muscle strength, and stability in all extremities with no pain on inspection.  (R. 803.)  Psychiatrically Plaintiff was oriented to time, place, person, and situation; he demonstrated appropriate mood and affect.  (*Id.*)  Dr. Mozumdar refilled Plaintiff's oxycodone early, noting it was for that time only.  (R. 804.)

On March 20, 2014, Plaintiff went to the emergency room at Pinnacle Health Harrisburg Campus with complaints of severe pain in his thighs and calves bilaterally.  (R. 822.)  Plaintiff reported that it had been going on since September and had been worse over the previous several days.  (*Id.*)  Noting that a muscle biopsy showed polymyositis and Plaintiff was scheduled to see a rheumatologist, he was also questioned about drug usage as set out in the previous section of this Memorandum.  On Review of Systems, Plaintiff complained of severe muscle pain.  (R. 823.)  Physical examination of his back showed no vertebral spine tenderness and no CVA tenderness.  (R. 824.)  Physical examination of his upper

extremities showed positive radial pulses, no evidence of significant acute upper extremity trauma, and no clubbing, edema or cyanosis.  (*Id.*)  Lower extremity examination showed no cyanosis, no clubbing, no edema, no calf tenderness, no palpable cords, and good muscle mass.  (*Id.*)  The examiner also noted that there was no fasciculations and no muscle tenderness and Plaintiff had good muscle strength in his lower extremities.  (*Id.*)   The doctor advised Plaintiff that there was no evidence of active myositis and that narcotic medication was not appropriate for his situation. (R. 824.)

On March 23, 2014, Plaintiff went to Holy Spirit Hospital with complaints of bilateral leg pain which he reported he had for five days.  (R. 721.)  He said he had gone to Harrisburg Hospital at the onset of the pain, he had a follow up visit with his primary care physician and had an appointment on March 26th for muscle disease. (*Id.*)  On examination, Plaintiff's extremities were non-tender with full range of motion, normal appearance, and no pedal edema.  (R. 720.)  The clinical impression was leg pain from polymyositis.  (R. 717.)

On March 26, 2014, Plaintiff saw Larissa V. Sachs, M.D., at the Kline Health Center for an office visit.  (R. 805.)  Dr. Sachs noted that Plaintiff's principle complaint was weakness, severity level 7, the problem is persistent, and the location includes bilateral quadriparesis and bilateral upper arm.  (R. 805.)  She

22

recorded that the activities affected include arising from a chair and lifting and that the symptoms were aggravated by exercise. (*Id.*)  Neurological/psychiatric review of systems was positive for extremity weakness and negative for anxiety and dizziness.  (R. 806.)  Musculoskeletal review was positive for joint pain and muscle weakness.  (*Id.*)  Musculoskeletal physical examination showed normal range of motion, muscle strength, and stability in all extremities with no pain on inspection.  (R. 808.)  He had no edema in his extremities.  (*Id.*)  Psychiatrically Plaintiff demonstrated appropriate mood and affect.  (*Id.*)  Dr. Sachs opined that adrenal insufficiency was the most likely cause of the sudden nausea, weakness and pain.  (*Id.*)  Dr. Sachs discussed the abrupt decrease in Plaintiff's prednisone dosage and suggested an alternate approach to lowering the dosage gradually.  (*Id.*) Regarding his polymyositis, Dr. Sachs noted "CK are stable.  He is not taking Imuran at this point.  IVIG was discussed by Dr. Kahn. He will see her again in 3 weeks."  (*Id.*)

On April 3, 2014, Plaintiff went to Holy Spirit Hospital with complaints of chest pain.  (R. 727.)  Review of systems did not indicate musculoskeletal problems and examination showed no problem with extremities.  (R. 728.)

On April 11, 2014, Plaintiff had an office visit at Kline Health Center with Namratha Kodali, M.D., to address his chronic conditions and refill his pain medications.  (R. 810.)  Plaintiff

23

stated that his symptoms were fairly controlled. (*Id.*)  However, he had complaints of pain in his legs and back, stating that he could not sleep at night because of the pain. (*Id.*)  Review of Systems indicates extremity and muscle weakness, back pain, and joint pain. (R. 811.)  Physical examination of extremities showed no edema present. (R. 813.)  Plaintiff was assessed with polymyositis and was to follow up with Dr. Sachs in June, stop Imuran and refill oxycodone. (*Id.*)

**c.   *Diabetes***

As noted above, Plaintiff went to the emergency room at Pinnacle Health Harrisburg Campus on September 19, 2013, for evaluation of hyperglycemia, thinking he had hyperglycemia because he had been having urinary frequency and thirst. (R. 886.) Plaintiff was directed to follow up regarding possible diabetes. (*Id.*)

In an office visit to Kline Health Center on September 23, 2013, the doctor diagnosed diabetes type 2 uncontrolled. (R. at 758).  The plan was to get all labs and then decide on treatment options. (*Id.*)

Plaintiff again had an office visit at the Kline Health Center on October 9, 2013. (R. 760.)  Office notes indicate that Plaintiff said he had gone back to the emergency room after his last office visit because "he started feeling the same way again." (R. 760.)  He had been put on metformin because his blood sugars

were high.  (*Id.*)  Plaintiff reported that he was feeling much better.  (*Id.*)  The plan was to continue Plaintiff on metformin and refer him to a diabetic educator/nutritionist.  (R. 764.)

Although diabetes mellitus type 2 is noted as a diagnosis following the initial diagnosis, associated difficulties are not identified.  (*See*, *e.g.*, R. 736, 839-41.)

**d.   *Hepatitis***

In an office Visit on February 15, 2013, Dr. Chakravarty diagnosed hepatitis C, hypertension and fatigue.  (R. 539.)

During a GI evaluation by CRNP Linda Woodin at Harrisburg Gastroenterology on August 8, 2013, it was noted that Roque had positive hepatitis C antibody and viral load.  (R. 599.)

On September 9, 2013, Plaintiff again saw CRNP Woodin at Harrisburg Gastroenterology.  (R. 598.)  His diagnosis was noted as chronic Hepatitis C and Plaintiff received his first PegIntron injection. (*Id.*)

At his December 18, 2013, visit with Dr. Chakravarty regarding complaints of increased extremity weakness (R. 789), Dr. Chakravarty noted that rheumatology was not able to start Plaintiff on any new medications because of his latent TB and hepatitis but they would try to work out another drug regimen when he returned to rheumatology in February.  (R. 793.)

On April 14, 2014, Plaintiff had another evaluation at Harrisburg Gastroenterology.  (R. 818.)  CRNP Woodin noted that

25

Plaintiff stopped treatment after his first injection (in September 2013) because of a reaction and he had not had any hepatits C treatment since that time.  (*Id.*)  She also noted that she would work with insurance to approve another medication for Plaintiff's treatment and contact him about a new plan after that.  (R. 819.)

On April 16, 2014, Plaintiff underwent a complete abdominal ultrasound that revealed a normal-sized liver, findings raising the possibility of fatty infiltration, and no definite morphologic changes of cirrhosis or obvious focal liver lesions identified. (R. 820.)

## *2.* **Hearing Testimony**

At the hearing held on June 19, 2014, in Harrisburg, Pennsylvania, before Administrative Law Judge Reana K. Sweeney, Plaintiff's attorney stated that Plaintiff was alleging the following impairments: migraine headaches, hepatitis C, left ulnar nerve neuropathy, polymyositis, diabetes, and hypertension.  (R. 30.)  Plaintiff initially testified that the health problem which he believed made him disabled was polymyositis.  (R. 44.)  He later stated that his "biggest thing" was migraines and polymyositis was secondary because of muscle weakness and pain.  (R. 65.)  In response to the question as to why these conditions are preventing him from working, Plaintiff stated: "Just tired and painful.  It's painful to pick things up, it's too--be on my feet for a while, long time and the kind of work I do, I just got to be on my feet

26

all day long." (R. 66.)  Plaintiff also testified that he did not believe he was disabled because of his mental health.  (R. 44.)

When the ALJ asked how Plaintiff reacts to the lack of objective testing to support his complaints of pain, Plaintiff responded that he was confused because he feels when he is in pain and has no energy and lies in bed all day.  (R. 45.)

The ALJ explored why Plaintiff did not follow up on the physical therapy referral and Plaintiff stated that Dr. Chakravarty told him he could do it himself (which he did for three weeks but stopped because he was achy and tired).  (R. 45-46.)  Regarding pain management Plaintiff testified that he had not tried a TENS Unit or had biofeedback, relaxation or learned special techniques to deal with his pain.  (R. 51-52.)  He said he occasionally did some massage of his leg himself and put warm compresses on his head for headaches.  (R. 52.)

The ALJ asked Plaintiff about past drug usage and alleged drug-seeking behavior.  (R. 39-40.)  Plaintiff said he had stopped using drugs in September 2011 and lied about his past usage because he would not be given pain medication if he admitted he was an addict.  (R. 40.)  Plaintiff testified that he was going to emergency rooms to get pain medication even though he was taking prescribed pain medication because some days his pain was too strong and he did not want pain.  (R. 50.)

Plaintiff testified that he was taking a lot of medications

27

(R. 49) and noted he experienced side effects of tiredness and drowsiness (R. 62).  When asked specifically about treatment for his hepatitis C, Plaintiff testified that he had discontinued interferon treatment the year before because his body rejected it and he had started on a new medication about a month before the hearing.  (R. 52-53.)  He also testified that he had a very low energy level and took several two to three hour naps per day.  (R. 62.)

Plaintiff testified that the worst muscle pain was in both thighs.  (*Id.*)  Resulting problems included walking and exercising--he was able to walk for fifteen to twenty minutes then needed to rest for fifteen minutes.  (R. 62-63.)  Plaintiff also noted that his legs became stiff if he sat for forty to forty-five minutes, and he experienced relief if he got up and stretched for five to ten minutes.  (R. 63.)  He said he had problems standing for thirty minutes or more because of thigh pain.  (*Id.*)  Plaintiff stated that he experienced upper extremity pain in his left arm--it was hard to grip and it got weak on occasion.  (R. 63-64.)  He believed the most he could carry would be ten pounds.  (R. 64.)

Regarding hepatitis symptoms, Plaintiff identified tiredness and all-over weakness.  (R. 64.)  Regarding concentration, Plaintiff testified that his ability to concentrate and focus was not good because of his migraine headaches.  (*Id.*)

At the conclusion of Plaintiff's testimony, the ALJ presented

28

the VE with hypothetical questions, including questions regarding
the availability of light exertional work with a number of
exertional and non-exertional limitations.  (R. 66-76.)  The ALJ
identified the following limitations:

> this individual has to be able to perform
> work either sitting or standing, except that
> an individual must be able to change, briefly
> change position every 40 to 45 minutes for up
> to 2 minutes before resuming the former
> position.  So we have a sit/stand, the change
> occurs every 40 to 45 minutes, but it's no
> longer than 2 minutes.  To that add the
> following; foot and leg pedals or levers
> bilaterally limited to occasionally, but
> there's no limitation with regard to merely
> pressing a button or a knob; foot and leg
> pedals or levers bilaterally limited to
> occasionally.  Again, no limitation with
> regard to merely pressing a button or a knob;
> climbing stairs or a ramp, occasionally;
> avoid altogether climbing a rope, ladders,
> scaffolding, or pole as part of the work;
> stooping, meaning bending to the waist level,
> occasionally; kneeling, occasionally;
> crouching and squatting occasionally; let's
> avoid altogether crawling on hands and knees
> or feet; no operation of a motor vehicle as
> part of the work; avoid concentrated exposure
> to extreme cold; concentrated exposure to
> wet, water liquids; concentrated exposure to
> fumes, dust, gases and poor ventilation.
> This is wasted on someone who continues to
> smoke, but as part of my RFC nonetheless.
> Avoid work in exposed to direct sunlight.
> With regard to noise intensity levels, avoid
> work at loud and very loud, loud such as in a
> can manufacturing department, very loud such
> as rock concert front row; no work around or
> with prescription drugs and marijuana.  I've
> had to add that because now it's legalized in
> some states, sold illegally in some states,
> so I want to make it clear.  All that is
> gone.  No work around that.  No work around
> or with hazardous machinery; in high, exposed

> places; around large, fast-moving machinery
> on the ground. . . . I'm limiting this
> individual to simple duties that can be
> learned on the job in a short period of time,
> which is the regulatory definition of
> unskilled work.

(R. 72-73.)

Plaintiff's attorney also questioned the VE, asking him two questions. (R. 76.) He first asked "if the individual when engaging in the sit/stand option every 40 to 45 minutes needs to take a 5 tp 10 minute break in which that individual is away from the work station and therefor [sic] off task, would that individual be able to sustain any of the jobs you've listed or any gainful activity?" (*Id.*) The VE replied "no." (*Id.*) The VE then asked "if the judge was to find Claimant's testimony credible, in that the individual was absent from work more than one day per month as a result of the impairments, would that individual be able to sustain any gainful activity?" (*Id.*) Again, the VE replied "no." (*Id.*) **3.** <u>**ALJ Decision**</u>

By decision of June 24, 2014, ALJ Sweeney determined that Plaintiff was not disabled as defined in the Social Security Act. (R. 20.) She made the following findings of fact and conclusions of law:

> 1.   The claimant meets the insured status
>      requirements of the Social Security Act
>      through March 31, 2013.
>
> 2.   The claimant has not engaged in
>      substantial gainful activity since
>      March 23, 2013, the alleged onset date

(20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairment: chronic headaches (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with normal breaks except the claimant must be allowed to briefly change positions between sitting and standing at least once every 45 minutes for a duration of no more than 2 minutes; can occasionally operate foot/leg pedals/levers and hand/arm levers/cranks but has no limitation with merely pressing buttons or knobs; can only occasionally climb ramps and stairs, stoop, kneel, crouch, and squat; can never crawl, operate a motor vehicle, or climb ladders, ropes, scaffolds, or poles; must avoid concentrated exposure to extreme cold, wet, water, liquids, fumes, dust, gases, and poor ventilation; must avoid all exposure to direct sunlight, loud and very loud noise intensity levels, with around or with hazardous machinery, work in high exposed places, work around or with prescription drugs or marijuana, and work around large fast moving machinery on the ground; and is limited to the performance of simple duties that can be learned on the job in a short period of time.

31

6.   The claimant is unable to perform any
     past relevant work (20 CFR 404.1565 and
     416.965).

7.   The claimant was born on November 2,
     1971 and was 41 years old, which is
     defined as a younger individual age 18-
     49, on the alleged disability onset
     date (20 CFR 404.1563 and 416.963).

8.   The claimant has a limited education
     and is able to communicate in English
     (20 CFR 404.1564 and 416.964).

9.   Transferability, of job skills is not
     material to the determination of
     disability because using the Medical-
     Vocational Rules as a framework
     supports a finding that the claimant is
     "not disabled," whether or not the
     claimant has transferable job skills
     (See SSR 82-41 and 20 CFR Part 404,
     Subpart P, Appendix 2).

10.  Considering the claimant's age,
     education, work experience, and
     residual functional capacity, there are
     jobs that exist in significant numbers
     in the national economy that the
     claimant can perform (20 CFR 404.1569,
     404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a
     disability, as defined in the Social
     Security Act from March 23, 2013,
     through the date of this decision *(20
     CFR 404.1520(g) and 416.920(g))*.

(R. 14-20.)  In determining that only Plaintiff's chronic headache

condition was a severe impairment, she found that it was

sufficiently established in the record where his other claimed

impairments--neuropathy, myositis, depression, and anxiety--were

not.  (R. 14-15.)  The ALJ determined that Plaintiff suffers from

polymyositis and neuropathy, citing a muscle biopsy showing inflammatory myopathy consistent with polymyositis (R. 14 (citing Ex. B28F at 84 (R. 903))) and EMG/NCS testing revealing some evidence of left elbow ulnar nerve entrapment (R. 15 (citing Ex. B19F at 4 (R. 642))).  In support of her conclusion that Plaintiff's polymyositis and neuropathy were non-severe impairments, the ALJ contrasted the biopsy and EMG/NCS findings with follow-up examinations that revealed little evidence of impaired motor strength or decreased sensation.  (R. 15 (citing Ex. 26F (R. 750-814) and Ex. 28F (R. 820-913)).)  The ALJ also stated that other providers noted Plaintiff's biopsy to appear somewhat nondescript (R. 15 (citing Ex. B15F (R. 595-600))) and his presentation to appear more consistent with drug-seeking behavior (R. 15 (citing Ex. B28F at 5 (R. 824))).

Regarding hepatitis C, the ALJ found that the condition remains "grossly asymptomatic without the need for ongoing treatments or therapies."  (R. 15 (citing Ex. B27F at 4(R. 818)).) Regarding diabetes, the ALJ found that it remained "controlled, uncomplicated, and non-insulin dependent."  (R. 15 (citing Ex. B26F (R. 750-814)) and B28F (R. 820-913)).)

The ALJ concluded the record does not demonstrate the presence of any medically determinable mental health impairments.  (R. 15.)

In making her residual functional capacity determination, the ALJ considered Plaintiff's symptoms and their limiting effects.

33

(R. 16-18.)  She identified the following difficulties claimed by Plaintiff: difficulty lifting, standing, reaching, walking, kneeling, seeing, concentrating, and using his hands; inability to keep a job due to migraine headaches which occur five days per week on average; neuropathy causes pain in his arm and difficulty maintaining balance; difficulty maintaining concentration; inability to walk more than six blocks before requiring at least fifteen minutes rest; medications cause him to become dizzy and tired; and inability to lift more than ten pounds without pain. (R. 16 (citing Ex. B2E (R. 189-96), Ex. B3E (R. 197-209), Ex. B10E (R. 236-39), and Hearing Testimony (R. 26-77)).)  The ALJ also identified the following limitations which Plaintiff asserted at the hearing: headaches continue to occur three to four times per week with symptoms of blurry vision, throbbing pain, and sensitivity to light; the headaches require him to lie down in a dark room for two hours and cause difficulty sustaining attention and concentration; fatigue; inability to walk longer than 15-20 minutes; and difficulty with prolonged sitting and standing due to stiffness.  (R. 17 (citing Hearing Testimony (R. 26-77).)

ALJ Sweeney concluded the evidence does not support the intensity, persistence, and limiting effects of Plaintiff's impairments as claimed by Plaintiff.  (R. 17.)  She contrasted Plaintiff's subjective complaints (R.17 (citing Ex. B3F (R. 358-64), Ex. B9F (R. 414-447), Ex. B13F (R. 499-515))) with providers'

notations of little evidence of any neurological impairments, decreased concentration, or sensitivities to light or sound when he presented to emergency care for treatment of headaches (R. 17 (citing Ex. B28F (R. 820-913))).

Regarding Plaintiff's chronic complaints, the ALJ noted that Plaintiff's neurological and physical examinations demonstrate little evidence of any deficiencies in sensation, motor strength, and reflexes, or evidence of impaired cranial nerves.  (R. 17 (citing Ex. B13F (R. 499-515), Ex. B16F (R. 601-20)).)

The ALJ also concluded that Plaintiff's allegations regarding the intensity, persistence, or limiting effects of his impairments are not entirely credible due to inconsistent information given by Plaintiff in the record, the medical reports, and at the hearing. (R. 18.)  The inconsistencies relate to Plaintiff's education and the reasons given for leaving his landscaping job considered in combination with his admission that he lied in order to obtain narcotic medication.  (R. 18 (citing Ex. B2E (R. 189-96), Ex. B28F at 5 (R. 824)).)

The ALJ did not find these factors alone inconsistent with a finding of disability but considered them in combination with the record as a whole.  (R. 18.)  The ALJ noted that the RFC accounts for Plaintiff's headache symptoms by limiting environmental tolerances and taking into account concentration difficulties. (*Id.*)  ALJ Sweeney also noted that she limited Plaintiff's

35

"exertional and non-exertional physical capacities to accommodate any reasonable degree of physical impairment based on the claimant's allegations of pain and his positive EMG findings, though noting the claimant's physical examinations nonetheless demonstrated little evidence of any impairment."  (R. 18.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can

---

[1] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 20.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is

limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not

38

sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See, e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the

court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here,

we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

## B. *Plaintiff's Alleged Errors*

As set out above, Plaintiff asserts the decision of the Social Security Administration is error because 1) the ALJ erred by finding Plaintiff's multiple impairments to be non-severe; 2) the ALJ erred in assessing the credibility of Plaintiff's statements about the severity of his symptoms; and 3) the ALJ erred in classifying Plaintiff's RFC as consistent with light work. (Doc.

13 at 2.)

## 1.   **Plaintiff's Non-Severe Impairments**

Plaintiff first asserts that the ALJ erred in finding Plaintiff's multiple impairments to be non-severe because he did not follow SSR 96-3p and provided "a perfunctory and highly inaccurate analysis" of Plaintiff's impairments.  (Doc. 13 at 16.) We conclude that any claimed error attributable to the ALJ's step two analysis would be harmless and not cause for remand.

Plaintiff maintains that most circuits have adopted a slight abnormality standard for severity, "holding that an impairment is not severe if it is only a slight abnormality which has such a minimal effect on the Claimant that it would not be expected to interefere with his or her ability to work, irrespective of age, educatin, or work experience.  (Doc. 13 at 16 (citing *Bailey v. Sullivan*, 885 F.2d 52, 56-57 (3d Cir 1989)).)

Though we do not discredit this standard, it cannot be considered in isolation.  We have had occasion to consider the issue of an ALJ's alleged failure to adequately consider and/or discuss alleged medical/mental health issues in several recent decisions, *Awad v. Colvin*, Civ. A. No. 14-CV-1054, 2015 WL 1811692, at *13 (M.D. Pa. April 21, 2015); *Martin v. Coleman*, Civ. A. No. 3:14-CV-1730, 2015 WL 1499874, at *13 (M.D. Pa. Apr. 10, 2015), and *Keys v. Colvin*, Civ. A. No. 3:14-CV-191, 2015 WL 1275367, at *11 (M.D. Pa. Mar. 19, 2015).  Because the Acting Secretary's decision

can only be deemed to be based on substantial evidence where the ALJ's analysis is sufficiently thorough, *see*, *e.g.*, *Dobrowolsky*, 606 F.2d at 406, an ALJ's failure to discuss medical problems documented and discussed by a plaintiff's treating physician falls short of the evidentiary standard, *see Martin*, 2015 WL 1499874, at *13.

Generally, when an ALJ finds an impairment non-severe at step two, the error is harmless where the ALJ finds in the claimant's favor at this step in the analysis. *Salles v. Commissioner of Social Security*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)). Because the outcome of a case depends on the demonstration of functional limitations, when an ALJ identifies at least one severe impairment and ultimately properly characterizes a claimant's symptoms and functional limitations, the failure to identify a condition as severe is deemed harmless error. *Garcia v. Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir. 2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Burnside v. Colvin*, Civ. A. No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

Although the ALJ found multiple impairments non-severe at step two of the sequential evaluation process, she found Plaintiff's chronic headache condition severe and proceeded through

the remainder of the five-step analysis with Plaintiff's severe and non-severe impairments and/or their functional limitations considered in combination to determine Plaintiff's RFC.  (*See*, *e.g.*, R. 14-20.)  As set out above, Plaintiff's multiple difficulties were considered in the RFC determination to the extent the ALJ had deemed them credible.  (R. 16-18.)  Plaintiff does not suggest otherwise, nor does he assert that any of his alleged impairments, if deemed severe, would independently meet or equal a listing at step three of the analysis, a finding which would entitle him to benefits without further inquiry.  Therefore, this claimed error is not cause for remand.

## 2.  **Plaintiff's Credibility**

Plaintiff next asserts that the ALJ erred in assessing Plaintiff's credibility in that she did not do a legally correct pain analysis and did not properly evaluate Plaintiff's testimony regarding the side-effects of his medication.  (Doc. 13 at 20-22.) We disagree.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be

disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p.

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated

to exist by medical signs or laboratory findings.  20 C.F.R. §
404.1529(b).  Once a medically determinable impairment which
results in such symptoms is found to exist, the Commissioner must
evaluate the intensity and persistence of such symptoms to
determine their impact on the claimant's ability to work.  *Id.*  In
so doing, the medical evidence of record is considered along with
the claimant's statements.  *Id.*

The regulations provide that factors which will be considered
relevant to symptoms such as pain are the following: activities of
daily living; the location, duration, frequency and intensity of
the pain or other symptoms; precipitating and aggravating factors;
the type, dosage, effectiveness and side effects of medications
taken to alleviate symptoms; treatment received other than
medication intended to relieve pain or other symptoms; other
measures used for pain/symptom relief; and other factors concerning
functional limitations and restrictions due to pain or other
symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-
vii).

The Third Circuit has explained:

> An ALJ must give serious consideration
> to a claimant's subjective complaints of
> pain, even where those complaints are not
> supported by objective evidence.  *Ferguson v.
> Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).
> "While there must be objective evidence of
> some condition that could reasonably produce
> pain, there need not be objective evidence of
> the pain itself."  *Green* [*v. Schweiker*, 749
> F.2d 1066, 1071 (3d Cir. 1984)].  Where

> medical evidence does support a claimant's
> complaints of pain, the complaints should
> then be given "great weight" and may not be
> disregarded unless there exists contradictory
> medical evidence. *Carter* [*v. Railroad
> Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.
> 1987)]; *Ferguson*, 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

Here the ALJ explained why she did not find Plaintiff completely credible. (R. 17-18.) She acknowledged the limitations Plaintiff claims to be associated with his alleged impairments and explained why she concludes the record does not support Plaintiff's allegations concerning the claimed intensity, persistence and limiting effects. (R. 16-18.) ALJ Sweeney cited many reasons she concluded Plaintiff was not completely credible--primarily the lack of objective medical evidence supporting Plaintiff's allegations, inconsistent information reported by Plaintiff, and Plaintiff's lying in order to obtain pain medications. (R. 17-18.)

Plaintiff specifically points to the ALJ's failure to credit the consistency of his statements and limitations of his activities. (Doc. 13 at 21.) He presents a list of those claims-- the substance of which are acknowledged by the ALJ--without addressing the reasons the ALJ relied upon to discount Plaintiff's allegations. (Doc. 13 at 20-23.) While Plaintiff's statements about pain and limitations of his activities may have been fairly consistent, his reliance on this factor is undermined by the fact that the lack of objective supporting evidence was also fairly

47

consistent.  Because Plaintiff has not presented any flaw in the ALJ's credibility assessment which would require remand and the extensive record review set out above contains sufficient evidence to support the ALJ's determination regarding Plaintiff's credibility, we conclude the claimed error is without merit.

3.  **Residual Functional Capacity Light Work Classification**

Plaintiff's last claimed error is that the ALJ erred in classifying Plaintiff's RFC as consistent with light work.  (Doc. 13 at 23.)  We disagree.

Social Security regulations define Light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls.  To be capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

Plaintiff cites to SSR 83-10, noting that it states that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time."  (Doc. 13 at 23.)  Plaintiff asserts that the ALJ limits Plaintiff to four hours of standing, a limitation which is inconsistent with the definition of light work.  (*Id.* at 23-24.)

48

While it may be that a full range of light work requires standing or walking for a total of approximately six hours of an eight-hour day, the ALJ did not find that Plaintiff could perform a full range of light work––she found that Plaintiff could perform light work with limitations (R. 16), one of which was the limitation cited by Plaintiff.  A review of the ALJ's questioning of the VE and the VE's testimony shows that both support the ALJ's conclusion that a person with Plaintiff's RFC is capable of performing light work with the limitations specified.  (R. 72-76.) For example, in identifying at least one of the available positions, the VE testified that it was his opinion that it was "posturally immaterial."  (R. 74.)  Thus, this argument regarding Plaintiff's limited ability to stand is without merit.

In support of his assertion that remand is warranted for further consideration of the ALJ's step five determination, Plaintiff points to SSR 83-12 and a conflict presented by the VE's testimony.  (Doc. 13 at 24.)  Plaintiff's reliance on SSR 83-12 regarding limitations on his ability to stand is misplaced, and his argument that the ALJ improperly relied on VE testimony which is contradictory to the Dictionary of Occupational Titles ("DOT") is without merit.

SSR 83-12 provides the following guidance regarding alternate sitting and standing:

> In some disability claims, the medical
> facts lead to an assessment of RFC which is

49

compatible with the performance of either
sedentary or light work except that the
person must alternate periods of sitting and
standing.  The individual may be able to sit
for a time, but must then get up and stand or
walk for awhile before returning to sitting.
Such an individual is not functionally
capable of doing either the prolonged sitting
contemplated in the definition of sedentary
work (and for the relatively few light jobs
which are performed primarily in the seated
position) or the prolonged standing or
walking contemplated for most light work.
(Persons who can adjust to any need to vary
sitting and standing by doing so at breaks,
lunch periods, etc., would still be able to
perform a defined range of work.)

There are some jobs in the national
economy-typically professional and managerial
ones--in which a person can sit or stand with
a degree of choice.  If an individual had
such a job and is still capable of performing
it, or is capable of transferring work skills
to such jobs, he or she would not be found
disabled.  However, most jobs have ongoing
work processes which demand that a worker be
in a certain place or posture for at least a
certain length of time to accomplish a
certain task.  Unskilled types of jobs are
particularly structured so that a person
cannot ordinarily sit or stand at will.  In
cases of unusual limitation of ability to sit
or stand, a VS (vocational specialist) should
be consulted to clarify the implications for
the occupational base.

SSR 83-12, 1983 WL 31253, at *4 (S.S.A.).

Our Circuit Court has explained that "SSR 83-12 does not

automatically dictate a finding of disability where an individual

is limited by a sit/stand option.  Rather, SSR 83-12 indicates that

a VE should be consulted." *Martin v. Barnhart*, 240 F. App's 941,

946 (3d Cir. 2007) (not precedential).  The Circuit Court noted

that "[w]e have not interpreted SSR 83-12 'to mandate reversal whenever the ALJ does not set out specific findings concerning the erosion of the occupational base if . . . the ALJ has received the assistance of a VE in considering the more precise question whether there are a significant number of jobs in the economy that the claimant can perform.'" *Id.* (quoting *Boone v. Barnhart*, 353 F.3d 203, 210 (3d Cir. 2004)).

Within this legal framework, it is clear that ALJ Sweeney properly relied upon the VE's testimony regarding Plaintiff's sit/stand requirements.  As set out above, ALJ Sweeney consulted the VE concerning jobs an individual could perform in the medium and light work categories with limitations including that the hypothetical individual "has to be able to perform work either sitting or standing, except that an individual must be able to change, briefly change position every 40 to 45 minutes for up to 2 minutes before resuming the former position.  So we have a sit/stand, the change occurs every 40 to 45 minutes, but it's no longer than 2 minutes."  (R. 72.)  Acknowledging there is no sit/stand option for any occupation at the medium exertional level, the ALJ asked the VE for five occupations that a claimant with the identified limitations could perform at the light exertional level. (R. 74.)  The VE identified five occupations such an individual could perform, stating that he based his testimony with regard to breaks and the sit/stand option as the ALJ defined it on his

professional experience as a vocational case manager over twenty-five years working with employers in Pennsylvania and surrounding states and attending professional conferences where other vocational experts discuss these situations.  (R. 75-76.)  Thus, the ALJ's step five determination did not run afoul of SSR 83-12 or Third Circuit caselaw and Plaintiff's argument to the contrary is without merit.

Plaintiff also cites SSR 83-10 for the proposition that light work entails use of the hands and he testified that he had weakness and numbness in his extremities.[2]  (Doc. 13 at 24.)  This is the sum of Plaintiff's argument in his supporting brief.  (*Id.*)

Plaintiff does not present any basis for remand with this assertion.  First, the ALJ limited Plaintiff's hand movement in that the RFC included the limitation that he could *occasionally* operate hand/arm levers/cranks.  (R. 16.)  Second, the ALJ acknowledged Plaintiff's assertions that he had difficulty using his hands and discounted Plaintiff's credibility in part because his neurological and physical examinations "demonstrate little

---

[2] SSR 83-10 states that a job is in the light category "when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work."  SSR 83-10, 1983 WL 31251, at *5 (S.S.A.).  The ruling also states that many unskilled light jobs "require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work." *Id.* at *6.

evidence of any deficiencies in sensation, motor strength, and reflexes[.]"  (R. 16-17.)  The review of medical evidence set out above clearly indicates this statement is an accurate summation of the record regarding findings related to Plaintiff's extremities. Therefore, Plaintiff has presented no basis for us to conclude the ALJ erred in his consideration of Plaintiff's alleged hand limitations in his RFC.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal of the Acting Commissioner's denial of benefits is denied.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: May 20, 2015